1    <u>COMPLAINT BY A PRISONER UNDER THE CIVIL RIGHTS ACT, 42 U.S.C §§ 1983</u>

2    Name _____

3         (Last)           (First)        (Initial)  **RECEIVED**

4    Prisoner Number _____

5                                ~~MAY 1 5 2008~~

6    Institutional Address _____

                                 RICHARD W. WIEKING
                                 CLERK, U.S. DISTRICT COURT
                                NORTHERN DISTRICT OF CALIFORNIA

7    UNITED STATES DISTRICT COURT

8    NORTHERN DISTRICT OF CALIFORNIA

9    Susan Mae Polk
   (Enter the full name of plaintiff in this action)

10              vs.            )  Case No. C08-1483 MMC(PR)
                           )  (To be provided by the Clerk of Court)

11    Dep. James Cavin, _____, Lt.  )

12    Matt Chettcow, Contra Costa City  )  **COMPLAINT UNDER THE**

13    Sheriff's Dept., Sheriff Rupf, Warden )  **CIVIL RIGHTS ACT,**
                              Title 42 U.S.C § 1983

14    Patrick, in their individual and official )

15    capacities, _____ Sgts Roberts & Gibson )  FIRST AMENDED
   (Enter the full name of the defendant(s) in this action)

16    *[All questions on this complaint form must be answered in order for your action to proceed..]*

17    I.    Exhaustion of Administrative Remedies.

18          [<u>Note:</u> You must exhaust your administrative remedies before your claim can go

19          forward. The court will dismiss any unexhausted claims.]

20          A.    Place of present confinement _CCWF_____

21          B.    Is there a grievance procedure in this institution?

22               YES (✗)    NO ( )

23          C.    Did you present the facts in your complaint for review through the grievance

24               procedure?

25               YES (✗)    NO ( )

26          D.    If your answer is YES, list the appeal number and the date and result of the

27               appeal at each level of review. If you did not pursue a certain level of appeal,

28               explain why. I cannot list the appeal number as I am in Ad
           Seg and my legal materials are in storage in VSPV for
           one of my complaints at CCWF. The other is listed.

COMPLAINT               - 1 -

I have requested that my materials be provided to me, but my request has been ignored. I am in Ad Seg for Protective Custody, and under CCR Title 15, 3164, may have my legal

1    1. Informal appeal _materials._

2    _____

3    _____

4    2. First formal level_____

5    _____

6    _____

7    wkOF:    3. Second formal level _Denied by Sheriff - 12/18/03 re_

8    _excessive use of force. (Ex Aa)_

9    _Re. pro-per policy - denied by Lt. Rubin 110's or 2106_

10   CCWF:    4. ~~Third~~ _Second_ formal level _My '602' was granted re access to legal_

11   _materials in or out of Ad Seg. Staff have refused to comply_

12   _with decision. Granted twice on ~~February 2~~ January 2 '08 and April 08._

13        _Log no. A-08-00004 (Ex D)_

     E.    Is the last level to which you appealed the highest level of appeal available to

14         you?

15              YES (X)        NO ( )

16   F.    If you did not present your claim for review through the grievance procedure,

17   explain why._____

18   _____

19   _____

20   II.    Parties.

21   A.    Write your name and your present address. Do the same for additional plaintiffs,

22         if any.

23   _Susan M. Polk, CCWF, PO Box 1508, Chowchilla, Ca_

24   _93610-1508_

25   _____

26   B.    Write the full name of each defendant, his or her official position, and his or her

27         place of employment.

28   _Dep. James Gavin & Lt. Matt Chartrau, Contra Costa County_

COMPLAINT                    - 2 -

1  Sheriffs Dept., PO Box 391, Martinez, Ca. 94553-0039
2  Warden Patrick, CCWF, PO. Box 1508, Choachilla, CA
3  93610-1508 ; Sgt. Roberts & Sgt. Gibson, CCWF, PO. Box
4  1508, Chowchilla, Ca 93610-1508

5  III.    Statement of Claim.

6        State here as briefly as possible the facts of your case.  Be sure to describe how each

7  defendant is involved and to include dates, when possible.  Do not give any legal arguments or

8  cite any cases or statutes.  If you have more than one claim, each claim should be set forth in a

9  separate numbered paragraph.

10        ( See attached statement )

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  IV.    Relief.

24        Your complaint cannot go forward unless you request specific relief.  State briefly exactly

25  what you want the court to do for you.  Make no legal arguments; cite no cases or statutes.

26  I want financial compensation for injuries sustained and

27  mental anguish. I also want an injunction to the Contra

28  Costa Cty Sheriffs Dept. to compel compliance with the

COMPLAINT                          - 3 -

constitutional right of access to self representation and the courts
in a meaningful manner, regardless of gender. Revision of policy re
aggressive officers by sheriffs dept. ~~Injunction to compel CCWF to~~
provide meaningful access to courts and compliance with Cal Code
of regulations, 3160 et seq. and specifically 3164 in or out of Ad Seg
of regulations, 3160 etseq, and specifically 3164, in or out of Ad Seg
whatever other remedy the court deems fit to devise.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this ___4th___ day of ___May___, 20 _08_

_____Susan Rea_____
(Plaintiff's signature)

COMPLAINT                    - 4 -

## III. STATEMENT OF CLAIM: BACKGROUND

1. On or about 10/17/02, I was charged with Murder I in the death of my husband.

2. I was arrested on 10/14/02 by officers of the Contra Costa County Sheriffs Dept.

3. I was placed in Martinez County Jail (MDF), and held there until April or May 2003, when I was transferred with all female inmates to West County Detention Facility (WCDF) in Richmond.

4. I was represented until the end of June 2003 by Liz Grossman and Kim Cupferer.

5. Liz Grossman told me to be patient. She would see about getting the charge dropped in the spring: my husband had died of a heart attack and the evidence was self-defence.

6. Until I was no longer represented by Liz Grossman, the hearings were in Walnut Creek before Judge Eaton, a former deputy sheriff.

7. I was escorted to most hearings by Dep. Lynch. She spoke familiarly about Liz Grossman, stating that she knew "Liz". And she said she knew about my case. She told me to obey my attorneys.

8. I had two large black eyes, evidence that supported self-defence. I was worried because neither the sheriffs dept. nor Liz Grossman had photos taken of me once the bruising set in. Liz Grossman never had any photos taken. When the bruising finally faded and the swelling went down, Deputy Lynch commented approvingly that I didn't have any photos.

9. Sgt. Chertkow came to my cell on or about 10/15/02. He said reporters were asking to talk to me. He told me that I'd better not talk to them. I complied out of fear. This placed me at a disadvantage. The DA's office and my husband's supporters took advantage of my silence and my attorney's silence by spinning a story that

(1)

was lurid and horrific. They claimed that I was mentally ill and had stabbed my husband 27 times after bludgeoning him.

10. My husband had a history of schizophrenia and aggression. He had attacked me on the night of his death, as he had before, threatening to kill me for leaving him. He punched me in the face, dragged me to the floor by my hair, after I pepper sprayed him, punched me again, smearing the pepper spray from his face in my eyes. When he attacked me with a knife, I did the only thing I could think of to save my life: I kicked him in the groin, disarming him.

11. My husband continued to attack me, biting my hand and grabbing at the knife. He was on top of me the whole time.

12. Dr. Cooper, a pathologist for the defense, testified that my husband had six stab wounds, none of which were or would have been lethal. (Ex A is his letter of May 2006 to the trial judge, Laurel Lindenbaum Brady, attesting to my innocence and describing the suppression of exculpatory evidence by county investigators and fabrication of evidence, which ultimately led to my conviction. Ex B is his declaration that my husband's injuries were not lethal, nor would they have been, absent a heart attack.)

13. Dr. Cooper testified that there was no evidence that my husband was bludgeoned. Lack of bruising to the laceration on my husband's scalp was definitive evidence that he sustained the injury from a fall after having a heart attack.

14. If Liz Grossman had proceeded to attack the evidence at a preliminary hearing, perhaps she could have gotten the charge dropped. I asked her to do an affirmative defence.

(2)

But Liz Grossman had no intention of going through with a preliminary hearing. At the end of June, 2003, she announced that she had completed a plea bargain to manslaughter; three years.

15. I was shocked. I asked what about getting the charge dropped, reminding her of her promise. She laughed, saying: "You believed that?"

16. When I refused, she yelled at me: "So fire me, Susan, fire me." I decided, I told her, that we should agree to part ways.

17. Kim Cupferer came to see me. She told me that I'd better take the deal. When I said I couldn't plead to something I didn't do, she said I'd better keep my mouth shut: No talking to reporters. And she said that if I didn't get an attorney on my "team" with "chutzpah", I'd get the death penalty. She told me: "I know you did well when you were representing yourself on your divorce .... You'd better not try that now." She said I'd never see a deal like they had.

18. When I saw Dep. Lynch again, she told me I should have listened to my attorneys. She said the DA might ask for the death penalty, or I'd end up with Life without Parole.

19. I tried to address the court. I was seeking bail so that I could get out and find an attorney and take care of my sons. Judge Eaton and deputies, including Lynch, told me I couldn't talk in court.

20. The DA cancelled the preliminary, which had been scheduled for July 2003. It was held in secret in August, 2003, while I was unrepresented. On or about August 25, 2003, I was indicted for Murder I.

21. My case was moved to Martinez, meanwhile, and

22. Meanwhile, evidence had been destroyed by County investigators: as my husband's body was cremated.

(3)

No internal organs were preserved. (b) my diary was suppressed, which I had kept on my computer. By the time it resurfaced, key portions had apparently disappeared. And the computer itself was broken. No bootable copy of the harddrive was provided until 2005. The diary had contained a day-to-day record of my life, including my husband's violence.

23. The week of August 22, 2003, Deputy Cavin was working court security under Sgt. Chertkowin Martinez.

24. At that time, I was unaware that Court Security had been assigned to investigate an anonymous letter I had sent about a week before my husband's death to seven judges in Contra Costa County. The letter was typed on my computer, and contained an exerpt from my diary. In my diary, I reported a conversation with my husband in which I had accused him of bribing a judge: Judge Kolin.

25. Judge Kolin was a juvenile judge. He was also formerly a deputy sheriff, like Judge Eaton.

26. Deputy Cavin had worked for Judge Kolin as his bailiff, an officer told me some years later.

27. I have three sons: Adam, Eli and Gabriel.

28. At the time of my arrest, Eli, then 16 years old, had just been sentenced to Byron Boys Ranch for eight months.

29. My husband was a psychologist. He had trained Contra Costa County Probation. One of his clients was a probation officer and one was in the Contra Costa Cty. DA's office.

30. When my husband was losing in divorce court, where I was self-represented, he said he'd use his contacts to "stop" me. When Eli got into a fight in the

c 4.

spring of 2002, my husband said he was going to use that to get custody of my minor sons, Eli and Gabriel.

31. Eli got into a fight with an older boy who had beaten up one of his friends, a particularly small young man. Eli had never had a fight before.

32. My husband became involved, and the incident was blown up into a charge of felony assault.

33. One of my husband's clients became Eli's probation officer. And Judge Kolin sentenced Eli to live with his father.

34. When my husband became abusive toward Eli, Eli fled, coming home, violating JEM rules. And Judge Kolin sentenced him to Byron, at my husband's request.

35. Eli was in Byron when my husband died.

36. The letter, though anonymous, was quickly identified as mine. It was not threatening or illegal in any way. I simply reported asking my husband how he had managed to get Eli sentenced to live with him, had he bribed the judge? And my husband had laughed, nodding his head.

37. I also reported in my diary, copied to my letter, asking my husband if he was a mossad agent, and that he became enraged at me and threatened my life.

38. On the night of my arrest, my computer was seized without a warrant, disappeared for about 30 days when it was finally logged into the evidence locker at the sheriff's Dept. It no longer worked, and descriptions of what had occurred in relation to Judge Kolin, my son, Eli, and the prosecution of Eli for a fight had been erased from the clone made by investigators. Sgt. Chestkow was one of the investigators.

(5)

39. About one half of my diary was gone, by that time I saw a printout from the clone, which could not be booted up until 2004: all references to certain associates of my husband had been deleted, as had the antics in Kolin's court.

## THE BATTERY

1. About a week before Dep. Cavin battered me, he was working court security outside Dept. 13 in MOF.

2. He asked me what I had in my hand. I told him it was a proper motion. He called it a "Faretta". He said: "They aren't going to let you file that." I thought, at first, that he was joking.

3. I said that it was my constitutional right under the sixth amendment to represent myself.

4. He said: "Not in this county."

5. I saw Sgt. Chetkow later, and I told him what Dep. Cavin had said. He told me I'd better keep my mouth shut and "submit". The hearing was postponed.

6. On 8/29/03, Dep. Cavin accosted me again outside the courtroom. It was around 8:30 am. He asked me: "Is that a Faretta?" I said: "It's a proper motion." (I didn't know what a "Faretta motion" was then.)

7. Cavin told me that I couldn't talk in court.

8. Around 8:30 am, I was escorted into the courtroom by Cavin. It was Dept. 13. I was surprised to see Dep. Lynch there, in the inmate section. Sgt. Chetkow was in the main courtroom. I was reminded of what Lynch and Kim Cupserer had said about the death penalty; and that I'd better not try to represent myself.

9. Deputy Cavin said that there were some people who wanted to talk to me from the Public Defender's Office. He reminded me: "Don't talk in court."

(6)

10. The inmate section in department 13 is screened off by plexiglass from the main courtroom. There is a window for inmates to confer with counsel.

11. The judge was not in the courtroom yet.

12. I went to the window and told the first public defender that the Public Defender's office had a conflict of interest. I had prepared a declaration about it to present to the court. Cavin told me to be quiet.

13. I was speaking in a very quiet voice, as is usual for me.

14. Ms. Mondt took the place of the first public defender.

15. I explained to her that one of the senior public defenders had come to see me. "He is a friend of my brother-in-law's attorney", I said, "Mr. Mackenzie," and I went onto say that Mr. Mackenzie, with his friends who were looking after my son, Gabriel, were attempting to influence Gabriel. I said: "They are brain washing Gabriel." And I said I thought that this created a conflict of interest.

16. Cavin was standing right beside me, listening to the conversation. When I said this about Mackenzie, Cavin bellowed: "I told you not to talk in court."

17. Then he hit me twice in the area of my left shoulder/chest.

18. I was stunned. I weighed 110 lbs at the time.* (I am 106-108 lbs now). I fell backwards.

19. I said to him: "Don't hit me." And to Ms. Mondt: "He hit me. You saw that. He hit me."

20. He said: "I think you need a time out. I can put you in a holding cell until 6pm."

21. Dep. Lynch was watching. She didn't say anything. I saw Sgt. Chertkow watching from the main courtroom.

+ I am 5' 5" tall.

〈7〉

He didn't say or do anything to intervene.

22. I asked: "what is it you people want? Do you want the death penalty now?" Then I said sarcastically: "why don't you just take me out and shoot me?"

23. I never raised my voice or offered any sort of resistance. I was just aghast at being assaulted by a deputy sheriff in a courtroom. And I turned to sarcasm in defence.

24. Dep. Cavin took me into the anteroom just outside Department 13, and backed me up against the wall with his chest. I was uncomfortable by this inappropriate touching, and I shied away into the holding area. He grabbed my arm, yelling: "How dare you resist me? How dare you resist me?" pulling my arm up behind my back.

25. I looked back, not understanding what was happening or why he was acting so strangely, and I saw a malicious grin on his face as he brought down a dark metal object against my elbow. I learned later it is called a 'black jack.'

26. The pain was excruciating. He had hit the 'funny bone', a nerve wrapping the elbow. I collapsed.

27. A deputy came running from the deputy station. I was calling: "help, help, he broke my elbow," in a flood of tears.

28. Cavin yelled: "she's resisting."

29. I wasn't resisting. I'd lost all power to stand on my own, the pain was so intense. "He broke my elbow," I cried.

30. Cavin and the deputy picked me off my feet by my arms behind my back, ripping the tendon that covers the elbow.

31. Then they dumped me on the floor of a 'visiting cell', which they use to hold prisoners in Ad Seg or P.C., locking the door.

32. A moment later, the door opened, and Dep. Lynch was there with two psychologists: Dr. Sigmund

(8)

and Dr. Martin. I was not in any sort of Mental Health treatment. I was in agony and tears from the pain.

33. Dr. Martin said; "Would you like to talk to me? I don't work for the county."

34. "Are you a medical doctor?" I asked. "I need a doctor".

35. When he said he was a psychologist, I said. "I have a broken arm. I don't need a psychologist." And I added that given my experiences with my husband, who was a psychologists, I didn't want to have anything to do with psychologists, thank you very much.

36. Dr. Martin and Dr. Sigmund had me placed in a padded cell for over an hour, chained to the floor, without any medical care.

37. I repeatedly asked for medical care. I was told I wasn't getting out of the cell until I agreed to talk to the psychologists. As I have no history of mental illness, and I knew my arm was broken, I was very surprised.

38. A few hours later, I finally convinced a sargent to call a doctor. He told the deputies that they had to get me to a hospital. My arm was broken. The tendon had swollen horribly and was hanging off my arm like a water wing.

39. Sgt. Chestleow appeared with a photographer. He was extremely hostile and aggressive. He refused to permit me to file a complaint. He said he had witnesses, and if I didn't shut up, he'd charge me with battery. I said I want to make a statement. He said he wasn't taking any statements from me. [I filed a declaration with the court. (Ex C) on or about 9/5/03]

40. In the afternoon, at around 3pm, I was taken to County Hospital by Dep. Jacobson, who behaved toward me

(9)

with extreme callousness. His comments were that if I'd had a lawyer, this wouldn't have happened. He tried to get the doctor to say my arm wasn't broken, it was just sprained. (This was the story Mr. Mackenzie told my sons.)

41. Xrays indicated that my elbow was broken, containing numerous fragments. (Ex D) I was given a prescription for tylenol with codeine and a splint.

42. My legal papers disappeared. Dep. Jacobson finally returned them at 12 am. They were in a legal file holder, envelope style, which had been opened. My papers were not in the order that I had left them in.

43. When I returned to WCDF, Dep. Kornblum was waiting the next morning to talk to me. In front of a group of officers, she told me that I was going to Bldg 4, Ad seg, and to pack my belongings and carry them. It was about 7 am. I was wearing a splint. She was, it appeared, furious.

44. She shouted at me that I was anti-semitic. I didn't know what she was talking about.

45. Dep Langford was also on duty in Bldg. 4. She said I wasn't getting any medication. I filed a grievance, and received it a couple of days later.

## PRO PER POLICY

1. Contra Costa County Sheriffs Dept. has a pro per policy which is discriminatory based on gender, and does not comply with US. constitutional requirements as set forth by the Supreme Court to provide meaningful access to inmates to the courts.

2. Women in custody in Contra Costa Cty are not allowed physical access to the Law bbrary. Men are.

3. Female inmates must submit their requests to the Law Librarian by interdepartmental mail for legal materials.

((0)

4. No legal books are provided. Inmates may request a specific case, statute, article or section of a book, and a copy may be provided, produced on a copy machine.

5. The Law librarian visits WCDF one or two times per week for the purpose of filling requests by female inmates.

6. He will accept 5 requests per slip.

7. Without access to law books, inmates who are women find themselves stymied by the process: if an inmate asks for self-defence cases, the law librarian replies: "You have to do your own research." The reply may come a week later.

8. After several more inqueries, the inmate may discover that the law librarian may provide copies of indexes.

9. The inmate may select a section from the index, such as "Bail" in Wests, only to receive the first page of that section. When she writes back requesting more, the law librarian will reply that she must ask by specific section. Eventually, she may receive a sub index.

10. An inmate who has been approved by the court as "pro per" is provided with a "proper kit" after a delay of one to four weeks. The "kit" consists of a few sheets of ruled paper, several golf pencils, an accordion folder, and indexes of legal books.

11. The pencils do not have erasers, and as they are not number two pencils, do not show up when copies of documents written with them are made by the librarian.

12. Inmates are not permitted to have pens, use type writers, or regular normal pencils. One no. 2 golf pencil per week may be purchased off of commissary. Indigent inmates receive two envelopes per week, one golf pencil, and five sheets of paper. Sometimes, the commissary distributes non-no. 2 pencils.

(11)

13. Upon requesting the chapter on Speedy Trial Rights from <u>California Criminal Law Procedure & Practice</u>, I received the first page, about a week after my request. When I submitted a request for the rest of the chapter, I received a subindex for the chapter, with the caveat that I could request five sections per slip. By the time I got the chapter, the issue of delays by the trial court and DA was exacerbated by the delays imposed by the Law librarian.

14. The Law Librarian was a former prosecutor. He frequently responded to my requests: "You need a lawyer!" *

15. The Law Librarian refuses to provide copies to female inmates of whole cases. Men can go to the Law Library and read whole cases, which are useful for research purposes, and essential for argument. Some rulings are best understood by the argument contained in the case. And subtle points may be entirely missed if one reads only the finding. The Law Librarian provides only the first page of the ruling. (I argued this point with him. when I was cut-to-court in 8/07 to 11/07, in a flurry of request slips. He finally began to provide me with whole cases. By then, I had been convicted already of Murder II, while self-represented.)

16. The proper inmate is provided with token access to a telephone for legal purposes: 45 minutes per day, five days per week to call three approved numbers.

   (1) A legal runner
   (2) A contact person
   (3) A private investigator.

17. My legal runners complained of being subjected to inordinate delays when they came to pick up filings. The first quit. Sometimes, they were told

(12)
* Or "get a court order!" or "Ask a lawyer!"

untruthfully that there weren't any filings. Per policy, I was supposed to be able to meet with the legal runner. In practice, more often than not, I was not allowed to, which made it difficult at times to communicate instructions effectively.

18. I needed my son, Eli's help to coordinate my defence and witnesses. The sheriffs department refused to approve him as my contact, which meant I had to use pay phones, running up huge phone bills.

19. I was not permitted to use a phone to call witnesses in private on an unmonitored phone. I had to use a pay phone, which is run by a company that blocks calls to many individuals. That meant I had no contact with some witnesses before trial, other than by mail, which was opened. With others, no contact.

20. I wasn't permitted to meet with my witnesses.

21. I was denied access to my legal papers.

22. Sheriffs deputies refused to transport my case files to court for trial. I had to get a court order and leave my files in court.

23. Per departmental policy, inmates in West county are awakened for court at 4:30 am. We are then held until about 6:30 am in holding cells or a holding area until transport arrives.

24. Once transported to MDF in Martinez, we wait in a holding cell until our scheduled court appearances. After appearing in court, we wait in the holding cell for a bus to take us back to WCDF.

25. Men are held in one of several large holding pens, lined with benches. Their cells are relatively uncrowded.

26. Women are confined in one badly ventilated small cell, containing three three-person benches. The cell is approximately 7' x 7'.

27. While the cell is designed to hold approximately

(13)

nine persons, as many as thirty women are packed in shoulder to shoulder, standing room only. Some women seek respite in the lavatory, which reeks of urine and feces. It does not contain a window or a fan, and no soap is provided. The lavatory is in a corner of the cell. At least, it has a door.

28. An inmate in trial is not returned to West County until 6:30 or 7:00 pm.

29. Sleep deprivation was a major factor at my trial, and is for any proper inmate housed in West County, male or female.

30. MDF houses only men since May 2003, except for a few women on "M-module", a co-ed mental health unit.

31. I submitted a civil rights motion to superior court in Martinez in February of 2006, after my grievances were denied at the highest level in January-February 2006, regarding the proper policy.

32. My motion was granted in part. I obtained access to my legal files on a regular basis.

33. Staff were also ordered to cease from shackling me in public hallways and on transport.

34. I enjoyed a brief respite from shackling, until a sheriff's deputy claimed that she did not recall removing my handcuffs when we returned one evening from court. On that basis, I was shackled again in transport.

35. Harrassment from deputies about being proper was incessant, and continued unabated. In february or March of 2006, after I objected to the trial judge's ruling, Judge Lindenbaum Brady called a "time out". And she went into her chambers.

36. Before she left the courtroom, however, Sgt. Mullux

(14)

ran up on me and began yelling: "You have to listen to our judge.. Don't argue with our judge."

37. I was shocked because I was pro-per. I am soft spoken and I was merely objecting, as is my duty, to preserve an issue for appeal. Moreover, Mullnix was not a regular in the courtroom and Judge Lindenbaum Brady seemed to approve of Mullnix' behavior. She was smiling.

38. I made a complaint, and Mullnix retaliated. She wrote a defamatory report. And a few weeks later she sandbagged me in the hallway. I was being escorted across a public hallway. Per the presiding judge's order, I was not in shackles or handcuffs. Normally, the security detail consisted of two officers if there were members of the public in the hallways. Mullnix had six officers line up in the hallway and told me loudly in front of the public to get my hands behind my back. This was nearly impossible, as I was carrying files. Normally it was not required, and Mullnix had never been my escort before. An officer took my files, and I put my hands behind my back. But I was embarrassed and even more so when Mullnix yelled: "I told you to get your hands behind your back." It was noon hour, and the hallway was crowded. My hands were behind my back. I was in trial already.

39. Mullnix then ran up on me and pushed me back against a wall, yelling: "You're still an inmate.. I told you to get your hands behind your back.. you do as you're told." All the while, her face was just a few inches from mine, she was spraying me with spittle and jabbing a key at my neck. When I said ..

15

"I'm going to report you for jabbing that key at my neck," she palmed it, because officers came over to see what I was talking about.

40. I filed a complaint on a grievance slip, and Mullnix retaliated with a "write up", claiming I disobeyed an order. I was sent to Bldg 4 - AdSeg.

41. Proper defendants are discouraged from their efforts by the above described policy. They are also hampered by lack of sleep and stress from conditions in the female holding cell.

42. We are not permitted to shower in the morning before court. That means that after returning at 6:30 or 7:00 pm in the evening, after a 14 hour day, we have to eat and shower and prepare for the next day of court.

43. I have always needed at least eight hours of sleep. By eight o'clock, I was knocked out. There was barely enough time to eat and shower, let alone prepare. But I would stay up as late as I could, organizing my notes, preparing my questions, and if there was a point to argue, trying to prepare an argument with the extremely limited resources I had: a few photocopies of a few sections of the evidence code, an old volume of California Criminal Law Procedure & Practice, which an attorney had given to me, and my notes.

44. My trial was three and one half months long. I was exhausted, particularly towards the end and when I testified, as officers had been finding pretexts to wake me up in the middle of the night.

45. I was in custody awaiting trial and sentencing for

16

four years. During that time, I only met one other woman who was in pro-per on her case before trial or during trial. The DA dropped the charges when she showed up with all her witnesses. But she was a rarity: someone willing to fight and with the support to do so and spirit.

46. Most women by far submitted to whatever pleas their public defenders arranged, and at a higher rate than men did.

47. The women said they just wanted to get it over with and that they feared reprisals.

48. They acknowledged pleading to crimes that they did not commit, playing crazy, and just going along with the show to avoid a retaliatory sentence and to protect family members.

49. While the county provides a token compliance with constitutional requirements that inmates be provided with access to the courts and the tools to attack their charges and sentences, those efforts are actively discouraged by sheriffs department personnel who are less interested in justice than in winning.

50. Female inmates are particularly pressured if they try to represent themselves. It is viewed as unfeminine. Female inmates are expected to be submissive and not argue.

51. When I was trying to get my files to court in August 2005, when my case was newly assigned to Judge Laurel Lindenbaum Brady's courtroom, I found myself the only inmate, male or female, subjected to shackling. I was admonished every time I came to court by deputies that I should have a lawyer.

52. Judge Brady also set my bail at the highest in the nation: $10,000,000, though I had made all court appearances while out on bail, and I had not broken any laws.

17

53. No arrangements were made for me to get my files to court, which I needed to argue motions, and once trial began, would need for examination of witnesses. The court and sheriffs department refused to help. I would drag my files in a plastic garbage bag down the halls, across the yard to the bus, up the steps, meanwhile trying to keep my grip with the handcuffs digging into my wrists and not get my feet tangled up in the chain between my ankles. A few times, I didn't succeeded in this last part, and fell flat on my face.

54. A few guards, out of pity or a sense of honor, carried my files for me, telling me: "we're not supposed to do this. Don't tell anyone."

55. The pretext for the shackling was an accusation that I had slipped my cuffs. I am very thin, and officers frequently joked that they didn't have handcuffs small enough to fit me. On or about 5/13/05, when my case was assigned to Judge Laurel Lindenbaum Brady's department, an officer warned me: "Don't let your cuffs fall off today," as I was getting on the bus. His partner then said: "You slip your cuffs Polk? I heard you slip your cuffs." I said that I never had slipped my cuffs. He said to shut up or he'd knock me on the floor and shackle me. I made a complaint. He filed a defamatory report. And from then on, I was shackled in transport, except for a week or so, after my civil rights motion.

## SHERIFF'S POLICY RE EXCESSIVE USE OF FORCE

1. The sheriffs department in Contra Costa County operates two jails: West County Detention Facility and Martinez Detention Facility (WCDF & MDF).

18

2. These facilities are used to train new recruits and to discipline officers who have gotten out of line in the community. They are assigned to WCDF and MDF.

3. Officers who have a history of aggression, like Cavin, are assigned to guard inmates, who won't complain or whose complaints will be ignored.

4. This policy exposes inmates to aggression from officers, and denies inmates their right to be treated with respect and humanely while awaiting a disposition or serving their time, rights guaranteed under the US and California constitutions.

5. Cavin is a notoriously aggressive unscrupulous officer. According to one of his fellow officers, Dep. Cavin must be watched all the time to make sure he doesn't beat up on someone. He also asked me to not say anything more about Cavin. Cavin kept reappearing in all the courtrooms I was assigned to for years, following the battery on 8/29/03. I went before eight or nine judges. Cavin would show up in each courtroom and behave in a menacing way. And I continued to complain about his behavior.

6. Judge Lindenbaum Brady ignored my "Pitchess" motion seeking Cavin and Chertkow's records in the fall of 2005.

7. Judge Lindenbaum Brady's husband was a lieutenant in the Richmond police department at the time. He is since retired. According to officers, she is "their" judge.

8. Nancy Chertkow, Judge Lindenbaum Bradys clerk, is Sgt. Chertkows wife.

9. Chertkow was Cavin's supervisor. At the very least, Chertkow is guilty of negligence in exposing me to Cavins aggression, given Cavins history of aggression, and his behavior towards me in court on 8/29/03.

10. Moreover, I had complained about Cavin a week before that he was interfering with my right to address the court and represent myself. Chertkows response

\19.

was threatening and he exposed me to Cavin's aggression, which resulted in my receiving a serious injury the next week.

11. The same can be said of the sheriff, Warren Rupf and the Contra Costa County Sheriffs Dept: the policy of placing officers who have a history of violence in charge of those most vulnerable to predation (inmates) is negligent and irresponsible. If the public isn't safe from officers like Cavin (that is if they aren't fit to be on the streets), then neither are inmates safe from them.

12. When I returned to Contra Costa County in April of 2007 and from August 19, 2007 to November 6, 2007, a number of officers told me to keep quiet. They also cautioned me to not try to get involved with my appeal. "Their judges" don't like to have "their verdicts" overturned.

13. Attorneys also told me that if I want a chance of getting out by getting a new trial or a sentence reduction, I had better be quiet. The judge doesn't want to look bad nor "does the sheriffs dept."

14. I was back in the county in 2007 for reimbursement proceedings under pen. c 987.8 in August to November and restitution in April. During these times, I saw Cavin again in MDF. He made remarks about having contacts in Chowchilla (VSPW and CCWF). He had friends there, he said. I was in VSPW in April, and in CCWF in August to November 2007.

15. Officers also frequently reminded me to be quiet if I don't want my son to get his probation revoked. He was on probation in Contra Costa County throughout this period.

16. The policy in Contra Costa County is to cover up employee misconduct by intimidating the victims and the victims family.

(20)

## TIMLINESS

1. I was warned not to press charges against Cavin or file a suit by officers and attorneys. These warnings dated from the battery on 8/29/03, through the statute of limitations, which expired on 8/29/07.

2. I was so intimidated, that from 8/29/03, the date of the battery, until 4/28/05 or thereabouts, I was not self-represented. The battery seemed to me to be related to my efforts to represent myself, which was a reasonable conclusion for me to come to based on the statements of the principle actors, Cavin and Chetkow, attorneys and fellow officers. The admonistions to not talk in court and represent myself also come from Judges, and particularly, Judge Laurel Lindenbaum Brady.

3. From August 2003, following the incident on 8/29/03, to the fall of 2004, I was represented at all hearings by the Public Defenders Office, over my objections that the office had a conflict of interest. Eventually, the Public Defender's office acknowledged a conflict.

4. I was in utter terror everytime I saw Cavin, which was throughout proceedings, although he is a Concord Police officer. I would begin trembling, which I couldn't control, which ultimately led to a flood of tears.

5. And I was terrified for my son, Eli, who was arrested and taken into custody twice, while I was awaiting disposition of my case, by officers of the Contra Costa County Sheriffs Dept.

6. The Sheriffs Dept., at that time, provided the officers who served in all police departments in the county, and still does, as far as I am aware.

7. My son, Eli, was my chief defense witness. He was

21

repeatedly under pressure from Contra Costa County Authorities, my husband's family, and associates of theirs on the west Coast in Contra Costa County to change his testimony, to whit that his father was violent and had threatened to kill me. The story the family wanted, supported by the DAS office and legal representatives of the family was that I was the crazy one and the violent partner, a tough sell, given my stature. I am 5'5" tall, 110 lbs at the time, now 108 lbs., and my demeanor. I am soft spoken. And I have no history of mental illness, criminality or aggression.

8. Eli was arrested and charged on phony pretexts to make him look bad at my trial, my lawyers told me, which is customary in Contra Costa Cty. in a big case.

9. Several officers including Deputy Langford, Deputy Heffstein, Deputy Kornblum, Deputy Weber, Deputy Cavin, and Deputy Rossberg repeatedly insinuated that my son would be hurt if I continued to represent myself. These comments continued in 2007, following judgment and sentencing and transport to prison on 2/27/07, when I was in WCDF and MDF, out-to-court from VSPW and CCWF in April 2007 and from August 2007 to November 2007.

10. Officers sought me out to make these comments, coming to my cell door to talk to me in August through November 2007, asking how my son was doing? Where he was? Was he managing to stay out of trouble? And reminding me to stay quiet and advising me not to try to interfere with my appellate lawyer, appointed to represent me on appeal, but to let my lawyer handle it. (I have submitted a number of motions to remove

( 22 '

appointed counsel based on IAC (ineffective assistance of counsel and a conflict of interest, and have a habeas petition pending on this issue)

11. I have had officers and attorneys repeatedly remind me that if I have a reversal on appeal and am retried, I will again be in the custody of Contra Costa Cty. Sheriffs Dept., so I had better not complain or make any trouble.

12. Cavins comments about having friends in Chowchilla terrified me. I have repeatedly been placed in cells with the most violent deranged offenders, and battered over and over again. Staff have told me: "That's how we handle inmates who like to complain"; "We have a union that protects us from inmates like you who like to file lawsuits"; and "We can give you the inmate from hell (if you complain)". One officer said he had a "back pack" full of "bombs" who can go off whenever he sets them to, so don't get on his bad side with complaints. I have repeatedly been told by prison staff to "shut up" and cease my legal efforts on appeal.

13. After being tortured for four hours by cell mates in May 2007, officers told me to let my lawyer handle my appeal. They said they'd had calls about me from the Contra Costa Cty Sheriffs Dept. and DA's office.

14. I was prevented from filing a complaint in county jail because I was intimidated, the law librarian refused to provide legal materials on civil matters, and I had been misinformed by an attorney who told me that the statute of limitations was six months.

15. When I got to prison in February 2007, I did not find out about a federal civil rights lawsuit until August from

( 23 )

a fellow inmate. I learned that the six months deadline applied to state torts, not a federal tort.

16. For most of the time that I have been in prison, I have been in Ad Seg for PC. Policy at CCWF and VSPW is to remove an inmates property when she goes to Ad Seg and place it in storage. Staff refuses to provide legal supplies in Ad Seg, stating, "Don't come to Ad Seg." When released from Ad Seg, it takes one or two weeks to get personal property back from Storage. By then, I have often been returned to Ad Seg for PC. I can request my legal supplies and property in Ad Seg, but obtaining them is problematic. At CCWF & VSPW, Ad Seg staff refuse to permit inmates in Ad Seg to have their legal supplies. They provide one ink pen per week, that is designed for Ad Seg out of a soft rubber, substandard circumference, and difficult to hold. It also runs out in less than a week. No paper is provided except for 20 pages per month for indigent inmates and 20 envelopes. Requests for my indigent supply have been ignored at times, at other times provided. Requests for extra supplies for legal purposes, have been denied, per Ad Seg policy. "You get nothin'," in Ad Seg, I am told. As I am in proper on a civil appeal and in civil cases, as well as on attack of my criminal conviction through a habeas process, the indigent supplies are insufficient. There are four lawyers in opposition on the civil appeal alone, with ten parties entitled to notice in each civil case.

17. When I went into Ad Seg at CCWF in June and August 2007, after arriving on June 22, Sgts. Roberts and Gibson denied all access to courts by denying access to Law Library materials, my own legal supplies, indigent supplies, phones, paper, envelopes, and my legal papers. It was not possible to contact the court. (See complaints E and F re denial of access to courts.)

18. I was also afraid to file a complaint against Dep. Cavin, Sgt. Chertkow and Contra Costa Cty. Sheriff's Dept., let alone the sheriff, Warren Rupf, because my son Eli was

( 24 )

Still on Probation in Contra Costa Cty, although he had moved to San Diego to live with my family. Contra Costa Cty refused to let Eli transfer his probation, even though it was only 'Court probation,' and the Probation Dept. was acting as if he was on a quasi-formal probation, threatening to violate him for not reporting in. He wasn't required to report according to policy in court probation.

19. I was also defending against two civil suits in Contra Costa Cty: R05-01667 (now under appeal) and another action. And I was representing my sons' interests as trustee of the trust I established for their benefit in Probate, P02-01714 and P05-02422, actions which are still pending. I knew I would have to return to Contra Costa Cty for these actions, and indeed, I was in Contra Costa Cty in October and November of 2007 on a civil case and appearing in MDF on that case. It was settled in November 2007. Case no. C05-01667 culminated in denial of a motion to vacate in February of 2008. I have appealed.

20. In the event that my appeal of the judgments in C05-01667 is successful, I may have to return to Contra Costa Cty. for court appearances. In any event, I will have to appear on case nos P02-01714 and P05-00422. I am in pro per.

21. Likewise, I may have to appear on the criminal case in the event my appeal is successful. I have very strong grounds for appeal.

22. On the date that the statute of limitations expired, and for ten days leading up to it, I was in the actual and physical custody of the Contra Costa Cty. Sheriff's Dept, subjected to threats and intimidation by custodial staff, including James Cavin. (8/29/07).

23. The Law librarian refused assistance with civil matters in Contra Costa Cty. at that time. (Ex. 6 and H.

(25)

the law librarian denied requests for civil materials, stating: "No civil" and "Go Get a Court Order"

24. My son, Eli, moved to Oregon in December 2007. I didn't find out until February 2008, when I was released from Ad Seg and able to call home.

25. I knew that one of the conditions of my son's probation was due to be satisfied in March 2008, which meant he might get off probation. I had been waiting for him to get off his probation or move it to another area, like San Diego.

26. Upon learning my son was living in Oregon, I obtained a Certificate of Indigency, which I had requested in December of 2007, and filed this lawsuit upon receipt of the certificate of Indigency, which was required for filing.

27. As long as my son was on probation in Contra Costa City, I was in danger of retaliation by staff, who had threatened to put Eli in jail again.

28. Ibid with civil cases pending and the appeal of my criminal conviction.

29. I also believe that Cavin and Chertkow can have me harmed in prison, though they do not work in Chowchilla prisons.

30. When I was out-to-court in August 2007 to November 2007, Lt. Bani Kollo, commander of WCDF told me he used to work for the CDC and has friends in Chowchilla. This was the day before I was returned to CCWF. (5/5/07). He mentioned that Chertkow is a friend of his. And he said that he would make some calls to CCWF about my court cases, and that he had been in contact with CCWF already.

31. I have decided to file in the hopes that by having courage, I might also obtain justice for myself, my son, Eli,

and the other men and women of my county who have given up hope and allowed themselves to be railroaded.

## THE DEFENDANTS

1. This suit seeks monetary damages from the principle actors involved in breaking my arm on 8/24/03, which left me with permanent damage. To date, I cannot straighten my arm all the ways and a doctor told me that I will never be able to do so. I am seeking monetary damages because I believe that the best way to ensure that inmates and the public are protected from loose cannons like Cavin and intimidation from officers like Chetkow is to set an example with a financial penalty.

2. Likewise, I am seeking compensation from sheriff Warren Rupf who bears primary responsibility for a policy which intimidates proper defendants and exposes the public and inmates to aggressive behavior from officers, behavior that is inconsistent with western ideals of democratic process and fairness.

3. Warden Patrick of CCWF bears responsibility and liability for a policy which deprives inmates in AdSeg for PC (protective custody) of access to the courts to address conditions of confinement, attack their criminal convictions, and defend against litigation when substantial interests are at stake. Warden Patrick's policy contributed to my failure to file this tort within the statutory deadline. If I had not been so intimidated by Cavin, Chetkow, and their comrades in the sheriffs Dept. and CDC, I could not have filed on time anyway, given denial of access to the most basic tools with which to do so: I had no supplies within the weeks leading up to the deadline while at CCWF due to this policy.

4. Sgts. Gibson and Roberts share liability for my failure to meet statutory deadlines by their refusal to

(27)

abide by statutory guidelines and departmental policy, which mandated that I be provided with (1) access to the Law library, however limited that is for Ad Seg inmates (eg. one day per week, three days per week); (2) the provision of indigent supplies from the monthly issue; (3) provision of extra supplies for legal work; (4) the provision of my legal materials from storage when I was in Ad Seg. Their conduct was discriminatory and unlawful. I was not permitted to attend law library, though I had signed up and had pending legal deadlines; and I was not given any supplies, while all other indigent inmates in Ad Seg were in August 2007.

5. I had complained of the problem with Sgt. Gibson already. I complained about Sgt. Roberts as soon as possible. Both complaints were submitted in August, 2007 on Emergency 602's promptly, and I requested expeditious handling. The 602 complaints were completely ignored for months, mooting the issue by the time I got a response.

6. This is the way that staff at CCWF handle complaints. They seek every pretext possible to evade a complaint and retaliate persistently. Warden Patrick is responsible for this policy, as she is in charge.

7. Given that I made a clear complaint that I had legal cases with deadlines pending, there was no excuse to continue to deprive me of legal supplies, with which I could have filed this tort on time, had I not been so intimidated.

8. Warden Patrick is liable for ignoring these complaints, and/or putting in force a system of handling complaints which obstructs the complaint process with deliberate disregard for the grounds of the complaint. For example,

28

in addition to inordinate delays, complaints are frequently screened out on phony pretexts, such as that the complaint is "duplicative." *

9. At the time I am writing this civil rights complaint, I am sitting in Ad Seg, where I was placed on 4/17/07 after being choked by a cell mate in GP. Sgt. Gibson was on duty that day. And I was denied the legal supplies and materials I had with me in GP.

10. I am writing this complaint on the back of a statute a well wisher sent me, because Sgt. Gibson and Ad Seg staff have refused to provide me with paper, as they have refused to provide access to my supplies, which are in storage now, such as paper, postage, pens, not to mention a type writer.

11. When informed that my 602 for access to legal supplies and legal materials in Ad Seg was "granted," I was told: "NOT IN AD SEG." "We'll give you a pen." "You get nothin'." "Sign a non-enemy chrono," attesting that even though I was choked, hit with a padlock, punched in the face twice, and spit on four times in GP, I don't have a need for protective custody or a transfer. This is because, I am told, the prisons are crowded, Ad Seg is crowded, and there are no protective housing units (PHUs) in California for women. "We don't have PC for women," staff say. In other words, I am told that if I want my legal materials, I have to pretend that my safety has not been jeopardized. "We don't want any liability," staff have said.

12. A court order is needed to compel CCWF to comply with constitutional guarantees that protect an inmate's right to access the courts in or out of Ad Seg, and particularly when she is in Ad Seg for PC.

Signed Under Penalty of Perjury; May sixth, 2008.

Susan Polk

29

* A year after submitting a complaint of officer and staff misconduct, it has still not been processed.

AUTHORITIES & CASE LAW

An officer may be sued for excessive use of force in violation of the 8th amend US. const. Hudson v McMillan (1992) 501 U.S. 294 (112 S.Ct. 995, 117 L.Ed. 2d 156); Whitley v Albers (1986) 475 U.S. 312 (106 S.Ct. 1078; 89 L.Ed. 2d 251)

An officer may also be sued for deliberate indifference to a serious medical condition or need. Estelle v Gamble (1976) 429 U.S. 97 (97 S.Ct. 285; 50 L.Ed 2d 251)

Reasonable access to the courts is a constitutional imperative. N.D. Cal. 197, Gilmore v Lynch, 319 F. Supp. 105, affirming Younger v Gilmore, 92 S.Ct. 250, 404 U.S. 15, 30 L. Ed. 2d 142.

A supervising officer may be liable for excessive use of force if he ordered it or he failed to properly supervise or train the officers who caused the injury. Redman V City of SD, 942 F.2d 1435, 1446 (9th Cir. 1991)

A supervising officer is liable if he participated in or directed or knew of violations and failed to act to prevent them. Taylor v List, 880 F.2d 1040, 1045 (9th cir. 1989)

Failure to properly supervise an officer is grounds for a suit. Rizzo v Goode (1976) 423 U.S. 362 (96 S.Ct. 598, 46 L.Ed.2d 561); Johnson v Duffy (9th cir. 1978) 585 F.2d. 740; Leer v Murphy (9th Cir. 1988) 844 F.2d. 628.

Re Timliness.

The doctrine of equitable tolling applies when a prisoner is prevented by custodial officials from filing. Pace di Guglielmo (2005) 544 U.S. 408, 418, 125 S.Ct. 1807.

31

When plaintiff fails to bring suit on time due to threats by the defendant, the doctrine of equitable estoppal applies. Sitt v Williams, 919 F. 2d 516, 522 (9th Cir. 1990). Likewise, if plaintiff is prevented by duress caused by defendant. Atteq v Najar, 15 Cal. App. 4th 1351, 1357 (1993).

Prisoners have a constitutional right to petition government for redress of their grievances, which includes a reasonable right of access to the courts. Hudson v Palmer (1984) 104 S. Ct. 3194. "Prisoners retain those first amendment rights of speech... protection of due process, and are ensured by Eighth amendment that they will not be subject to cruel and unusual punishments."

Inmates in Ad Seg for non-disciplinary reasons have same rights to legal materials as inmates in G.P. Sec. 3164, Title 15, CCR (Cal Code of Regulations).

Inmates in Ad Seg or out may show that shortcomings in library or legal assistance program hindered his efforts to pursue a legal claim. "When any inmate... shows that an actionable claim which he desired to bring has been lost or rejected, or that presentation of claim is currently being prevented, because capability of filing suit has not been provided, he demonstrates that the state has failed to furnish adequate law libraries or adequate assistance from persons trained in the law, in violation of constitutional right of access to the courts." U.S. CA Const. amend. 14.

(32)

The law favors trial on the merits of an
action. Court must resolve any doubts in favour
of granting permission for case to proceed.
Bettencourt v Los Rios Comm. College Dist. (1986)
42 Cal 3d 270 (228 Cal Rptr. 190), Ebersol v
Cowon (1983) 35 Cal 3d 427 (197 Cal Rptr. 601).


Respectfully submitted,

Susan Ree   5/6/08
Susan Ree

(33)



*ad*

Connty nf Contra Costa

Office of the Sheriff

Warren E. Rupf
Sheriff

December 18, 2003

Ms. Susan Polk
West County Detention Facility
5555 Giant Highway
Richmond, Ca  94801
Building 8A

Dear Ms. Polk

This letter is to inform you that the investigation into your complaint against Deputy
James Cavin in which you alleged you were hit with a metal "truncheon" on August 29,
2003 has been completed.

Sergeant Matt Chertkow of Court Services conducted the investigation. His report was
reviewed by; Lieutenant Mike Fisher of Court Services, Captain Dave Pascoe of
Detention Division and by Commander George Lawrence of the Custody Services
Bureau. There was further review by Undersheriff Ronald Jarrell.

Your allegation of force could not be substantiated. Therefore, you allegation has been
classified as **unfounded**. That means; the investigation has disclosed sufficient evidence
to prove that the act complained of did not occur as alleged.

Due to the restrictions imposed by California Penal Code Section 832.7, we are unable to
release any further information concerning the officer involved. The record is considered
confidential and cannot be disclosed to anyone, or in any criminal or civil proceeding,
except by discovery pursuant to the Evidence Code.

Sincerely,

**WARREN E. RUPF**, Sheriff

Mike Casten Lieutenant
Professional Standards
(925) 335-1519

Post Office Box 391 • Martinez, California 94553-0039
(925) 335-1500
*"Community Policing Since 1850...."*

May 7, 2006

Honorable Judge Laurel Brady
California Superior Court, Contra Costa County
A.F. Bray Building, Department 31
1020 Ward Street
Martinez, California 94553

Dear Judge Brady:

In view of the hostile behavior of the prosecuting attorney following my testimony on Thursday, culminating in his refusal to proceed with cross-examination, I am hereby withdrawing from any further participation in People v. Polk.

It is regrettable that I was unable to completely fulfill my designated role in the case during the week I had set aside for it. It was my privilege to appear in your courtroom, and none of what follows is in any way intended to reflect unfavorably upon the Court. I hold Mr. Sequeira completely responsible for last week's debacle. Perhaps he has forgotten that justice isn't always about winning.

Allow me please to review the facts as I see them: Susan Polk is on trial for murder, because Dr. Brian Peterson, a county contractor, saw fit to present a distortion of the autopsy evidence to the Coroner, to the District Attorney's office, to the Grand Jury, and ultimately to the trier of fact in a murder trial. Not only has Mrs. Polk been indicted on false pretenses, but she has also suffered from protracted false imprisonment and estrangement from her sons as a result of Dr. Peterson's false representations.

My purpose last week was to provide a thorough exposition of the physical evidence, in sufficient detail and clarity that everyone....including the jury, the Court, the prosecuting attorney, the media and ultimately the public.... would not merely find a reasonable doubt as to the charges, but would actually see that the evidence fully exonerates Mrs. Polk. Moreover I wanted everyone to see this for themselves, rather than asking them to rely upon the opinion of one expert witness versus that of another. I have no doubt that I succeeded in this. However, normal procedure would have afforded me opportunity to further solidify my testimony by responding to cross-examination questions about the evidence, and would have allowed Mr. Sequeira an opportunity to try to create doubts about the testimony, if he chose to do so. He chose not to; instead, he created a dramatic smokescreen about some discovery issues that have no bearing on the physical evidence, and certainly have nothing whatsoever to do with the fact that an innocent woman is being held on false charges.

Mr. Sequeira is in an untenable situation, so I understand why he would want to postpone dealing with the evidence. He must either take the unconscionable path of pursuing a conviction, or the politically impossible path of dropping the charges and, in effect, admitting to the taxpayers that it was all a big mistake. I don't expect him to do either; I expect him to opt for the more astute strategy of provoking a mistrial, one which can be

blamed on a defense expert and will not reflect adversely on the Court or the District Attorney's office. Thus the innocent defendant goes free, while the county saves face. This is what I believe Mr. Sequeira is leading up to. Whether this is proper or not, it is certainly clever, and potentially may serve the cause of justice.

Given the corner Mr. Sequeira has been backed me into I have no choice but to withdraw from the case. Here are my reasons:

1) I set aside one week for this trial, and I have other obligations that will not allow me to return to Martinez before the trial wraps up. The nature of the evidence is not responsible for the delay; neither, certainly, are Susan Polk or myself. The Court decided not to allow postponement of testimony of a local, captive witness in consideration of two out-of-state witnesses, and the prosecuting attorney elected to launch into histrionics over irrelevant discovery issues, rather than getting on with his cross-examination. I have made myself very adequately available to this trial, in good faith, but legally binding obligations elsewhere will now not allow me to make myself further available than I already have.

2) Mr. Sequeira has placed me in an impossible situation by goading the Court into ordering me to perform a feat I had already declared myself – under oath - unable to perform, and without giving me any further opportunity to protest. This forces me to choose to either fail to comply with a court directive, or to make compliance moot by removing myself from the case.

3) Knowing the difficulties of an in-demand expert witness making himself available for a trial halfway across the country, Mr. Sequeira is attempting to circumvent fairness in these proceedings by delaying cross-examination of a key witness sufficiently long enough to make further participation not feasible. The issue he has concocted to disguise this tactic is altogether phony. In the first place, the contention that I relied upon anyone's statement in arriving at my opinions is completely out of line, as none of the opinions to which I testified had anything whatsoever to do with whether or not Susan Polk's version of the events was truthful. Indeed, I was expressly forbidden to express any such opinions. My statement that her version of the events was fully consistent with the autopsy evidence was a statement of fact, not opinion. Were this not so, you would have ordered it stricken from the record. Moreover whatever discovery materials Mr. Sequeira desired were a matter for the pre-trial period, and it was highly improper for him to decline to ask for anything and then attempt to portray me as a secretive, uncooperative witness for not providing it. My concerns that Mr. Sequeira would have resorted to dirty tricks to prevent me from testifying, had he known how decisively exculpatory my testimony would be, were evidently very well founded. Nor am I under any legal obligation to bring anything whatsoever to court if nothing has been subpoenaed or at least requested, particularly when everything upon which I relied in reaching my opinions, or about which I intend to testify, is already on exhibit. I have never brought anything with me to the witness stand, and this has never been questioned. Mr. Sequeira's contrivance constitutes obstruction of justice. His insistence on irrelevant, non-discoverable and previously unrequested materials, going to the extreme of demanding that the

Court send me across the country to retrieve said materials, under threat that he will not proceed with cross-examination otherwise, constitutes an unwarranted delay in the proceedings and an abuse of criminal procedure. All of this is obviously designed to deprive the defendant of the benefit of a key expert witness. Mr. Sequeira's machinations are improper and underhanded, and it causes me great concern to see that they have been tolerated to such an extent by the Court.

4) Finally, I am outraged by Dr. Peterson's irresponsible, unprofessional and, to my way of thinking, immoral conduct. For your information, I also have detailed knowledge of cases in which Dr. Peterson or members of his group have participated in covering up gross medical or nursing care negligence, wrongful death and, in one instance, even homicide. I refrained from discussing his connection with these incidents on the stand, because I wanted to maintain the focus on the evidence in the Polk case. The evidence of deceitful presentation of evidence by Dr. Peterson in this present case is conclusive, and I am profoundly disturbed about it. I consider this man to be nothing less than a public menace. Combining this highly charged issue with having a defendant without proper counsel, I find myself feeling and acting more like an advocate than an impassive witness. Mr. Sequeira's exceptionally belligerent manner really brought this out. Since I believe that any hint of advocacy or emotionality on my part could adversely impact upon Mrs. Polk's defense, I believe I ought to withdraw, even if it were only on these grounds alone.

In summary, I have compelling reasons for resigning from this process. I signed on to help all parties concerned arrive at a just conclusion to these proceedings, and I believe I have done my best in this regard. However now that Mr. Sequeira has contrived to make my record-keeping the central issue instead of continuing to prosecute the case based on the facts in evidence, my continued participation can only be an impediment to the cause of justice...and this is morally unacceptable to me. Moreover his stalling tactics have caused me to run out of time to participate in this trial.

I will not be answering my phone this week, since I intend to make myself inaccessible to the media until this matter is resolved, and also I must travel, but any message left on my answering machine by your office will receive the most prompt attention possible. If you still want the file, then of course I will send it, but I cannot imagine it will be of much use if I am not available to testify as to its contents.

Respectfully yours,

John T. Cooper, M.D.

1  Susan Mae Polk
   2005008816
2  8A-33WCDF
   5555 Giant Highway
3  Richmond, CA  94806

4

5

6

7

8        SUPERIOR COURT FOR THE STATE OF CALIFORNIA

9             COUNTY OF CONTRA COSTA

10 PEOPLE OF THE STATE
   OF CALIFORNIA,
11                                    No. 05-031688-7

12
   Plaintiff,                        DECLARATION OF
13                                    DR. JOHN T. COOPER, MD

14 SUSAN POLK,

15        Defendant.
                                    /
16 _____

17        DECLARATION OF DR. JOHN T. COOPER, MD

18 Review of the transcript of my testimony under oath will confirm that your notes are correct:  the

19 stomach wound would be expected to lead to peritonitis over the course of several hours, which could

20 potentially eventuate in death in several days, if untreated.   Since we have a record of this sworn

21 testimony, I see no need for a separate sworn statement, nevertheless I am making this statement via

22 e-mail under penalty of perjury.

23

24
   Dated: Monday, June 12, 2006
25

26 John Cooper, M.D, Forensic Pathologist

27

28

Susan Polk
West County Detention Facility
Bldg. #, #22
5535 Giant Hwy.
Richmond, Ca. 94806

(Copy 2 of 4)
and
submitted 2 copies
for Judge Coleman
9/5/03
August 30, 2003

On August 29, 2003, at around 9:00 a.m., I was escorted into Judge Brown's courtroom in Martinez. While I was there, the Judge did not enter the courtroom. I was told to wait in an enclosed area just inside the court separated by glass from the rest of the room. A public defender on the other side of the glass partition asked to speak to me which we did. After discussion, I sat down to wait. A few minutes later, another public defender, Ms. Mondt, asked to speak to me and motioned for me to come to the partition where there is a window designed to permit attorney/client conference. I spoke with her for several minutes. The deputy told me to be quiet. I was moving away to sit down when Ms. Mondt gestured for me to approach again. She talked for awhile, then I answered quietly, and the deputy said loudly and in an aggressive manner that he had told me to be quiet. I turned and my three or my life shouted, I said "Don't hit me." I turned to Ms. Mondt and said, "He hit me." The deputy then

12:00 am by Deputy Jacobson when I
arrived back at the West County
Facility. The papers had been rearranged
in my file.

I was then transferred to Bldg
4 the disciplinary unit

I declare under penalty of
perjury that the foregoing is a true
and correct statement to the best of
my knowledge.

/s/ _____ 3/30/03

( copy 2 off )

I cried and told deputies that the deputy had broken my arm. The pain was unbearable. A nurse came after awhile, but I was too distraught to talk to her at that time. A representative from Mental Health came over. As I was too upset and I couldn't stop crying from the pain and the shock that a deputy would do that to me, I refused to talk to him. He ordered that I be placed in a padded cotton shrunken thing. I was not being aggressive. I was sitting on the floor crying and afraid I was going to be attacked.

After an hour or so a nurse reappeared. She refused to order x-rays, saying I had a contusion. I requested to speak to a sergeant. I told him what had happened and that I wanted to make a "formal" complaint. He said it was being looked into and said would I take a written statement from me. I said I needed to see a doctor and asked why I was being detained in a padded cell at all.

time, I was told it was because the mental health professional had said I was a danger to myself. I was consequently not known as a danger to him.

Later a female psychologist asked if I would talk to her and I agreed. She took a history. I asked why I was being detained in a padded cell, and she said because the other psychologist said that I may be a danger to others.

At my request, I was placed in a regular cell.

After the interview, the doctor approached the command anyroom and said I liked to get a nap. I did not _____.

_____ returned later. I _____ _____ his name is Sgt. _____ he would _____ a _____ on _____ I would the _____ own _____ _____ Sgt. _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ _____ that I _____ to make

(Copy 2 of 4)

a formal complaint and gave a written statement. Sgt. Minetin said Sgt. Cherkow was handling the investigation. I turned to Sgt. Cherkow and asked if I could give him my statement. He said he wasn't taking any statements from me. I asked if he [Lieut] want to hear what happened? He said he'd already heard from the deputies involved.

About 5:00 or 6:00 p.m. I was taken to County Hospital. X-rays showed my right arm was broken in the elbow area. My tendon was damaged as indicated by substantial swelling. After several hours I was returned to Martinez.

My court papers including evidence was a sealed legal file. I dropped it when I was clubbed. I requested that Deputy Jacobson return it to me in Martinez when I informed him it was important it contains confidential information. It was not returned until

told me I'd have to leave for a time
out. I went with him. He said maybe
I'd like to spend all day waiting in a cell.
He then pushed me into the anteroom
outside the courtroom. I'm yelling
"You pushed me, you pushed me. How
dare you think you can raise me."
I did nothing to resist. The
deputy then grabbed my arm behind
my neck and bent my elbow into
a small translation. Turning was
against me. I went into pain and
begged him to let me go. Finally
he said I will if you promise to
calm down. I said yes so he
then unlocked me and I ran
to Judge Baxter's office and woke it
up so loud that it was annoying. I was
taken to the holding cell and left there
until I was to depart for
[illegible]

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF CONTRA COSTA
### MARTINEZ

RE: PEOPLE v. Susan Polk

DOCKET NUMBER: 05-031668-7

**DECLARATION OF CUSTODIAN OF RECORDS**

I, _____Carree Coley_____ declare as follows:

1) I am a duly authorized Custodian of Records of Contra Costa Regional Medical Center & Contra Costa Health Centers in Martinez and have authority to certify records.

2) The business is located at: 2500 Alhambra Ave., Martinez, California 94553

3) The copies enclosed are true copies of records requested by the Subpoena Duces Tecum served on date: March 24, 2006

   a) The records requested are:

      1) Hospital or clinic treatment records;

      2) Admission records and summaries;

      3) Reports by a Surgeon, Radiologist, Physician, or other medical staff member;

      4) Nurses notes and laboratory reports used in treatment of the above-mentioned patient;

      5) Discharge summaries and follow-up reports.

   b) The records being produced are copies of requested medical records relating to the treatment of: Polk, Susan    Medical Record# 79-55-08-1    Date of Birth: 11/25/1957    Treatment dates: 8/29/03

   c) The other records requested by the Subpoena are unavailable for the following reasons:

4) The records enclosed with this declaration were prepared by personnel of the above business in the ordinary course of business, at or near the time of the act, condition, or event described in the records.

5) The original records were prepared in the following manner: Admission and treatment records are prepared by medical staff members, nurses, and other clinical personnel at the time the patient enters the facility and throughout the patient's treatment. Observations, comments, and patient descriptions are noted and retained in the file. Nurses notes are kept at the station where the patient is treated. Records of treatment, observations, and other activity are noted regularly on these records.

6) The original records were obtained from: Each patient treated at this hospital or health center has an individual file which contains copies of all documents prepared during the course of treatment. The requested documents were removed from the patient's file, photocopied, and the photocopies were forwarded to the court.

I declare under penalty or perjury that this declaration is true and correct.
Executed on date: March 28, 2006 _____ at Martinez, California. _____

Signature of Custodian of Records

D L

CONTRA COSTA HEALTH SERVICES
CONTRA COSTA REGIONAL MEDICAL CENTER
CONTRA COSTA HEALTH CENTERS

DIAGNOSTIC IMAGING DEPARTMENT

REPORT

Ordering MD:
Order  Date:
Order  Time:

| | |
|---|---|
| MR#: | M007955081 |
| Name: | POLK,SUSAN |
| Ph #: | (510)262-4200 |
| DOB: | 11/25/57     Sex  F |
| Loc: | 3-B |
| Acct# : | M074693904 |
| PCP: | |
| PCS: | MART |

---

-SERVICE DATE:-08/29/03
-SERVICE TIME:-
Ordering Physician:   John I. Ellis, M.D.

RIGHT ELBOW:  FOUR VIEWS

HISTORY:   Elbow injury.

FINDINGS:  Minimally displaced comminuted fracture of humeral lateral epicondyle,
with multiple small fragments.  Elbow effusion.  No dislocation.  Normal bony
mineralization.

CONCLUSION:

Comminuted humeral lateral epicondyle fracture.


-Michael A. Price, MD

PRIM       : JLG
Dictated   : 08/30/03 1124
Transcribed : 09/01/03 0047                          RADIOLOGY

Contra Costa Regional Medical Center (PCI: OE Database CCS)

THOMPSON CHRISTINA                        Page 1 of 1

CONTRA COSTA .    \LTH SERVICES
CCRMC, Martinez Health Centers
2500 Alhambra Avenue, Martinez, CA 94553

MR#:    G. ,9-55-08-1
NAME: POLK, SUSAN
DOB:   11/25/1957

Ex A

**EMERGENCY DEPARTMENT REPORT**

DATE: 8/29/2003

CHIEF COMPLAINT: Elbow pain.

HISTORY OF PRESENT ILLNESS: The patient is a 45-year-old female who presents ambulatory in custody of the Sheriffs, for evaluation of right elbow pain and swelling. The patient states that she was struck on the outer aspect of her elbow prior to the onset of symptoms. She has no other musculoskeletal complaints. No focal weakness. No sensory changes. The patient received Tylenol prior to arrival in the emergency department, with some improvement in her symptoms.

PAST MEDICAL HISTORY AND MEDICAL PROBLEMS: None.

MEDICATIONS: None.

ALLERGIES: None.

HOSPITALIZATIONS/ SURGERIES: None recent.

SOCIAL HISTORY: As above.

REVIEW OF SYSTEMS: Pertinence above, otherwise noncontributory.

EXAM: VITAL SIGNS: Normal as documented by nursing notes, reviewed by myself. GENERAL: Awake, alert, conversant, no obvious distress, non-ill appearing. EXTREMITIES: Examination of the right elbow reveals evidence of noticeable effusion over the posterior aspect of the elbow apparently involving the bursa. Range of motion of the elbow itself was intact with pain with extension and flexion. There is tenderness to palpation over the lateral aspect of the distal humerus and along the elbow joint itself. Pronation and supination were intact. Distal motor, sensory and vascular of the extremity was intact.

DIAGNOSTIC STUDIES: X-ray of the right elbow were obtained, reviewed, showed evidence of comminuted fracture of the lateral epicondyle of the humerus. Several small fragments were noted. No other abnormalities were appreciated.

IMPRESSION: Distal humeral fracture, as above.

PLAN: Long-arm splint, followup in Ortho Clinic. Vicodin, ibuprofen as comfort measure. Information sheets provided. The patient was discharged ambulatory, in stable and good condition.

Jon K. Beauchamp, MD

JKB:clh  d: 09/02/2003 03:06 PM  T: 09/02/2003 08:39 PM Job: 16811641

ORIGINAL
Page 1 of 1

EMERGENCY DEPARTMENT REPORT

EMERGENCY 2d LEVEL APPEAL                                    6

## INMATE/PAROLEE APPEAL FORM
CDC 602 (12/87)

Location: Institution/Parole Region
1. CCWF                    Log No. A-08-0000    Category 10
2. _____    2. _____

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME Susan Polk | NUMBER X23154 | ASSIGNMENT | UNIT/ROOM NUMBER 504 134 |
|---|---|---|---|

A. Describe Problem: I was served by the litigation Unit w/ legal papers in ad ongoing civil case Friday thursday, Aug 9 & Aug. 13. I was not issued any paper & envelopes on 8/10/07. When other persons in this unit were who were indigent. I am indigent, & signed up for the paper. Also, I signed up for the Law Library on monday, Aug. 13, and Sgt. Roberts said I could not go because other people were going. I explained that I have pending due dates this week (8/17) & ~~I~~ for filing aresponses, and I need paper- envelopes & access to the law library. Sgt. Roberts response was that other people have

If you need more space, attach one additional sheet. per due due dates too and I can wait til next month or paper

B. Action Requested: Title 15 § 3164 provides that inmates placed in Ad Seg will have access to the law library & legal supplies. I am in Ad Seg for non disciplinary reasons. Sgt. Roberts action is forcing me to forfeit cases which entail an irreparable loss to me. I request immediate provision of pen ~~& ink~~ (,) paper, envelopes & law library access while in Ad Seg.

Inmate/Parolee Signature: _____    Date Submitted: 8/14/07

C. INFORMAL LEVEL (Date Received: _____ )

Staff Response: _____

_____

_____

_____

Staff Signature: _____    Date Returned to Inmate: _____

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

_____

_____

_____

Signature: _____    Date Submitted: _____

Note: Property/Funds appeals must be accompanied by a completed
Board of Control form BC-1E, Inmate Claim

CDC Appeal Number: _____

JAN - 2 2008
JAN - ___ ___

AUG 16 2007

S /07 Emergency 2d vel Appeal                    Ex E

STATE OF CALIFORNIA                                          DEPARTMENT OF CORRECTIONS

**INMATE/PAROLEE**       RECEIVED    Location.  Institution/Parole Region   Log No.         RECEIVED
**APPEAL FORM**          MAY 3 0 2007   1. _____        1. _____    JUN 1 9 2007
CDC 602 (12/87)                                                              INMATE APPEALS OFFICE
                         INMATE APPEALS OFFICE                               VALLEY STATE PRISON FOR WOMEN

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME Susan Polk | NUMBER X23159 | ASSIGNMENT | UNIT/ROOM NUMBER A-4 |
|---|---|---|---|

A. Describe Problem: I have civil cases with pending due dates for filing responses. One is not clue. I have an appeal with pending due dates. Since my arrival at VSPW on 2-7-07, I have repeatedly requested my legal material in storage, in order to take out some documents I've and my law books, as is my right under Title 15. I have requested PC (protective custody since my arrival as I have EIFs in this facility (enemies in the facility). I was told I could not have legal material in Ad Seg & that VSPW doesn't have PC on 5/4/07, after I was assaulted by an inmate in C-4-73L, I was placed in Ad Seg & denied the paper work I had with me, which I received in the mail, & told I can't have legal papers in Ad

If you need more space, attach one additional sheet. This is a violation of Title 15, Rules on Appeal & Cal Rules of Court. The refusal to provide legal paperwork is retaliatory.

B. Action Requested: Immediate provision of my legal paperwork, and access to law library and copy service.

NOTE THIS IS AN EMERGENCY 2d LEVEL APPEAL.

Inmate/Parolee Signature: _Susan Polk_                        Date Submitted: 5/16/07

C. INFORMAL LEVEL (Date Received: _____ )

Staff Response: _____

_____

_____

_____

Staff Signature: _____          Date Returned to Inmate: _____

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

_____

_____

_____

_____

Signature: _____                        Date Submitted: _____

Note: Property/Funds appeals must be accompanied by a completed      CDC Appeal Number:
Board of Control form BC-1E, Inmate Claim

# CONTRA COSTA COUNTY
# DETENTION FACILITY

( ) INMATE REQUEST FOR INFORMATION     ( ) MEDICAL REQUEST

To: _____

From: _____ Bkg # _____

Date: _____ / _____ / _____ (DOB)  Housing Assignment: _____

Check One:    (✓) Request    ( ) Grievance    ( ) Appeal    ( ) Other

Request: _____
_____
_____
_____
_____
_____
_____
_____
_____
_____ Too Much
Date Rec'd: 11 / 3 / 07  Rec'd By: 1MING

Routed To: _____

ANSWER:          ( ) APPROVED          ( ) DENIED-(state reason)
_____
_____
_____

By: _____  Date: 11 5 07

Pink: Kept by Inmate     Yellow: Reply to Inmate     White: To Booking
DET 024: FRM 1/2/91

# CONTRA COSTA COUNTY
# DETENTION FACILITY

(x) INMATE REQUEST FOR INFORMATION        ( ) MEDICAL REQUEST

To: _Law Library_

From: _Susan Polk_          Bkg # _2007 01527_

Date: _10/10 /07_    (DOB) Housing Assignment: _4-14 WCDF_

Check One:    (x) Request    ( ) Grievance    ( ) Appeal    ( ) Other

Request: _(1) Please provide full copy of_
_Pompa v Johnson (2004) 14 Cal Rptr. 3d_
_750 (Cal App. 6 Dist. 2004)_
_I am working on a petition for a_
_writ of Habeas Corpus and on a motion_
_in the underlying case._

_Thank you_
_and you also provide a copy of_
_the entire U.S. constitution?_
_S.P._

---

Date Rec'd _10/10/07_ Rec'd By: _GUYSF_

Routed To: _____

ANSWER:        ( ) APPROVED        ( ) DENIED-(state reason)
_x You need a Court order_

By: _____    Date: _10/11/07_

Pink: Kept by Inmate        Yellow: Reply to Inmate        White: To Booking
DET 024: FRM 1/2/91

✎ JS 44  (Rev. 12/07) (cand rev 1-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS
Susan Mae Polk

**DEFENDANTS** Dep. James Cavin; Lt. Matt Ckertkow; Contra Costa County Sheriffs Dept, Department, Worden Patrick, CCWF et al

(b) County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)
Madera County

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.
Contra Costa County

(c) Attorney's (Firm Name, Address, and Telephone Number)
self-represented

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [X] 3  Federal Question (U.S. Government Not a Party)
- [ ] 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [X] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury— Med. Malpractice | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal 28 USC 157 | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 365 Personal Injury — Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881 | | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 630 Liquor Laws | **PROPERTY RIGHTS** | [ ] 450 Commerce |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 340 Marine | **PERSONAL PROPERTY** | [ ] 650 Airline Regs. | [ ] 830 Patent | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 345 Marine Product Liability | [ ] 370 Other Fraud | [ ] 660 Occupational Safety/Health | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 690 Other | | [ ] 490 Cable/Sat TV |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | [ ] 810 Selective Service |
| [ ] 160 Stockholders' Suits | [X] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 710 Fair Labor Standards Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 190 Other Contract | | | [ ] 720 Labor/Mgmt. Relations | [ ] 862 Black Lung (923) | [ ] 875 Customer Challenge 12 USC 3410 |
| [ ] 195 Contract Product Liability | | **PRISONER PETITIONS** | [ ] 730 Labor/Mgmt.Reporting & Disclosure Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| [ ] 196 Franchise | | | [ ] 740 Railway Labor Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | [ ] 510 Motions to Vacate Sentence | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 892 Economic Stabilization Act |
| | [ ] 441 Voting | **Habeas Corpus:** | [ ] 791 Empl. Ret. Inc. Security Act | | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 442 Employment | [ ] 530 General | | **FEDERAL TAX SUITS** | [ ] 894 Energy Allocation Act |
| [ ] 220 Foreclosure | [ ] 443 Housing/ Accommodations | [ ] 535 Death Penalty | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 444 Welfare | [ ] 540 Mandamus & Other | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 240 Torts to Land | [ ] 445 Amer. w/Disabilities— Employment | [ ] 550 Civil Rights | [ ] 462 Naturalization Application | | |
| [ ] 245 Tort Product Liability | [ ] 446 Amer. w/Disabilities— Other | [ ] 555 Prison Condition | [ ] 463 Habeas Corpus — Alien Detainee | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [X] 440 Other Civil Rights | | [ ] 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- [X] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from another district (specify)
- [ ] 6  Multidistrict Litigation
- [ ] 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. §1983
Brief description of cause:
I was assaulted and battered by a deputy when I tried to file a proper motion

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 360,000 unknown
CHECK YES only if demanded in complaint:
JURY DEMAND:  [X] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY
PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)
[X] SAN FRANCISCO/OAKLAND    [ ] SAN JOSE

DATE  4/28/08

SIGNATURE OF ATTORNEY OF RECORD  Susan Polk

CCWF S04-236
P.O. Box 1508
Chowchilla, Ca 93610-1508

LEGAL & CONFIDENTIAL

**RECEIVED**

MAY 15 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CCWF STATE PRISON

United States District Court
450 Golden Gate Avenue
San Francisco, CA 94102